Filed 8/3/16  Vaughn v. Darwish CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JACK VAUGHN et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BARBARA DARWISH et al., <br><br> Defendants and Appellants. | B252762 <br><br> (Los Angeles County <br> Super. Ct. No. BC454063) <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING AND MOTION TO STRIKE** <br><br> **[Change in Judgment]** |

The opinion filed herein on July 6, 2016, is ordered modified as follows:

Page 25:  delete the current Disposition and insert the following Disposition in its place:

The August 28, 2013, judgment is modified so that the following plaintiffs are awarded the following amounts of punitive damages:  Vaughn—$60,000 against each of the four defendants Barbara Darwish DBA 13 Wish Trustee, Barbara individually, David individually, and Gingko Rose (collectively, the four punitives defendants) ($240,000 total); Hernandez—$60,000 against each of the four punitives defendants ($240,000 total); Hart—$25,000 against each of the four punitives defendants ($100,000 total); Rodriguez—$25,000 against each of the four punitives defendants ($100,000 total); Johnson—$25,000 against each of the four punitives defendants ($100,000 total).  The judgment is affirmed in its entirety as so modified as to these plaintiffs, in light of their already timely consent in writing to such a reduction pursuant to California Rules of Court, rule 8.264(d).

 As to plaintiff Goldson, following the initial filing of this Court's opinion, the Court was informed that Goldson apparently died in April 2016.  Attorneys for both sides may have been aware of this issue prior to oral argument but neglected to inform the

Court in a timely manner. The matter is remanded to the trial court to consider the impact of Goldson's death and determine if an award of punitive damages in his (or his possible estate's) favor is proper, with a potential punitive damages award, if appropriate, not to exceed $30,000 against each of the four punitives defendants ($120,000 total).

In all other respects the judgment, including the attorney fees award in favor of plaintiffs, is affirmed. Plaintiffs shall recover their costs on appeal.

This modification effects a change in judgment.

Appellants' petition for rehearing and motion to strike consent to decrease in amount of judgment are denied.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JACK VAUGHN et al., | B252762 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC454063) |
| v. | |
| BARBARA DARWISH et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Amy Hogue, Judge.  Affirmed as modified, subject to Plaintiffs/Appellants' consent.

Mesisca Riley & Kreitenberg, Dennis P. Riley, Rena E. Kreitenberg for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Caroline E. Chan for Defendants and Appellants.

_____

Defendants, through a foreclosure sale, purchased a property housing long-term tenants. After the purchase, defendants continually harassed the tenants, attempting to force them to vacate the premises. The tenants sued. A jury awarded the tenants (plaintiffs) compensatory damages and punitive damages.

Following the original entry of judgment, the trial court entered two amended judgments. We determine these latter judgments are void, and the original judgment is effective. We deem the awards of punitive damages excessive, however, and therefore reduce the punitive damages awards, conditioned on plaintiffs' consent.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants, appellants, and cross-respondents David and Barbara Darwish[1] are real estate investors who buy foreclosed properties in association with various entities in which one or both spouses have interests, including defendants, appellants, and cross-respondents Gingko Rose Ltd. (Gingko Rose) and Logerm LLC (Logerm). In 2010, the Darwishes learned of a foreclosed property on Hyperion Avenue in Los Angeles. They caused the property to be purchased on August 27, 2010, in the name of a trust, with Barbara, doing business as 13 Wish, as trustee.

Plaintiffs, respondents, and cross-appellants Jack Vaughn, Esmeralda Hernandez, Wayne Hart, Dennis Goldson, Carlos Rodriguez, and Ernest Johnson are long-time tenants of the property, which consists of a two-story house. At the time defendants purchased the property, plaintiffs each occupied single rooms in the house, except for Vaughn, who occupied two rooms. The house had four kitchens and four bathrooms, two of each upstairs and two of each downstairs. The floors in the house were not connected by an interior set of stairs, as a prior stairway had been converted into a room in which Hart lived. Thus, the second floor, where a number of plaintiffs lived, was accessible only by an exterior set of stairs.

---

[1] For ease of reference, the Darwishes are often referred to by their first names in this opinion.

2

Disputes between plaintiffs and defendants arose almost immediately after defendants purchased the property. Plaintiffs filed a lawsuit against defendants in January 2011 alleging numerous claims, including tortious breach of warranty of habitability and quiet enjoyment, retaliatory eviction, and violations of the Los Angeles Rent Stabilization Ordinance (LARSO) (L.A. Mun. Code, § 151.00 et seq.).

## A. **First phase of trial**

The trial was conducted in three phases. In the first phase, the legal claims were tried to a jury. We summarize the evidence in a light favorable to the judgment (see *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 846, fn. 4) as follows:

Plaintiff Vaughn first met David on August 27, 2010, when David came to view the house. David told Vaughn the Darwishes intended to purchase the property and asked Vaughn how many people lived there. Vaughn responded that the house had six units housing seven people, including one child. David told Vaughn that the "D.A." would not let the tenants live there, that they would not be able to get relocation money, and that they "might as well leave right away."

Soon after the Darwishes bought the property, they called a landlord-tenant meeting. At the meeting, Barbara and David requested information from plaintiffs including their age, how long they lived at the property, and how much in monthly rent they paid. Plaintiffs provided information, including how much rent they paid to the prior owner, which ranged from $450 to $855 per month. At the meeting, Barbara gave plaintiffs a list of other rental properties owned by the Darwishes with monthly rental rates. When plaintiffs said they would rather be paid to relocate and choose their next residences themselves, Barbara indicated that no relocation assistance would be provided.

On September 23, 2010, Barbara wrote a letter to plaintiffs claiming that none of them gave her information regarding their rental agreements. The letter also stated that plaintiffs had the "options" of either (i) remaining as tenants and paying monthly rent of

3

$825 per room per month (significantly more than plaintiffs had been paying[2]) or (ii) receiving $1,000 in return for relocating to another residence within 30 days. The next day, plaintiffs' attorney wrote a letter to Barbara informing her of plaintiffs' contact information and how long they had lived at the property, and reconfirming their rate of monthly rent at the time of purchase.

On or around September 27, 2010, Barbara received a "substandard order" from the City of Los Angeles Department of Building and Safety. The order stated that, based on an inspection, the property was determined to be substandard because of the unapproved use of a "single family dwelling" as a "boarding house." The order also noted several maintenance and repair issues in the house, including problems with the electrical system and plumbing. At trial, the city inspector testified that more than six tenants were living at the property without a certificate of occupancy for a boarding house. Based on the zoning requirements for the property, 1,500 square feet could only accommodate one unit, so even if the house was 6,000 square feet, only four units would be allowed. The inspector also noted that during his inspection he identified an illegal kitchen and an illegal bathroom upstairs. While he was inspecting the property, David told the inspector to "be careful" because David had "retired judges working for" him and would "sue the city." Barbara testified that she did not attempt to address the repair issues identified in the substandard order.

On September 29, 2010, Barbara prepared a notice to quit addressed to Walter Majano, the former owner of the property. The notice stated that the property had been foreclosed upon and instructed tenants to vacate the premises. At the time she prepared the notice, Barbara knew that Majano no longer owned the property. She also knew the names of the actual tenants, but chose not to directly address the notice to them. Shortly thereafter, Barbara wrote a letter to the inspector who issued the substandard order, stating that the tenants were being evicted and that the home would soon be restored. On

---

[2]    Vaughn, whose rent under the prior owner of $855 per month was substantially higher than any other tenant's, occupied two rooms.

October 12, 2010, Barbara caused to be filed an unlawful detainer complaint, naming only Majano as a defendant.

Around this time, three tenants, Vaughn, Goldson, and Hernandez, mailed checks to Barbara for payment of rent, based on the rates that they most recently paid. The checks were never cashed and, according to Barbara, she never demanded any rent.

On or around October 20, 2010, Barbara received a letter from the Los Angeles Housing Department. The letter stated the property was subject to the LARSO, that tenants could not be evicted because of foreclosure, and that the September 29, 2010, notice to quit did not provide a legal reason for eviction. Barbara was requested to provide a written cancellation of the notice. Barbara received a second letter from the Los Angeles Housing Department a few weeks later reiterating that foreclosure was not a permitted reason for eviction of a tenant. The letter stated that, if Barbara sought to recover possession of the units to comply with the substandard order, she was required to serve a proper notice to vacate and pay relocation fees to the tenants. Barbara did not cancel the notice to quit or attempt to pay relocation fees.

The unlawful detainer action was decided in favor of the tenants on January 14, 2011. The trust holding title to the property was ordered to pay $43,955.60 in attorney fees to Vaughn and Hernandez. On January 19, 2011, Barbara prepared a grant deed transferring the property from the trust to Gingko Rose. Although the deed described the transfer as a "bonafide [*sic*] gift," Barbara testified at trial that the property was transferred to avoid foreclosure by Gingko Rose because it had lent money for the initial purchase. Barbara said, however, that there were no documents evidencing the loan and she did not know the terms of the loan. David testified that they never intended to have Gingko Rose own the property. He was impeached with a declaration he signed stating that Gingko Rose was always intended to be the owner.

In March 2011, Gingko Rose received letters from the Los Angeles Housing Department referencing notices to allow access to premises or quit served on the tenants in January and February 2011. The letters reiterated that the property was subject to the

LARSO and stated that the tenants were entitled to relocation assistance in the event of eviction.

The first time David had any work done on the property was in August or September 2011, approximately a year after issuance of the substandard order. David testified that, among other things, he had an upstairs kitchen and shower removed. Plaintiffs testified that David had other facilities removed, including a kitchen in Vaughn's room, a second kitchen upstairs, and an upstairs bathroom. In addition, David had Hart's room, which was located above a former stairway, demolished, and converted the area into an interior stairway.

Throughout this period the property remained unregistered under the LARSO. In March 2012, Barbara, on behalf of Gingko Rose, sent a letter to the Los Angeles Housing Department enclosing a check for, according to the letter, "[r]egistration of [seven] rooms which are currently rented individually at [the property]." The letter further stated: "This is the first time that the property is being registered." At the time of trial in December 2012, Barbara had "not yet" received a certificate of registration for the property.

In April 2012, Barbara and David served on each tenant a three-day notice to quit. The notices listed Gingko Rose as the owner, identified the tenants' monthly rent rates, ranging from $450 to $855, and demanded payment of 10 months' back rent. David had never asked for rent prior to this time because, according to his testimony, the property was "substandard."

At trial, plaintiffs uniformly testified that they endured incessant harassment from the Darwishes. From the time they purchased the property, the Darwishes would repeatedly arrive at the house unannounced, walk through the house, and tell plaintiffs to throw away personal items. They frequently videotaped and took pictures of the tenants, their rooms, and their vehicle license plates. David told several plaintiffs that he had sued many people, that he knew the tenants' license plate information, and that he would follow them for decades. Barbara called one tenant a "sex offender." She told an African-American tenant that she knew he was on parole and would have him arrested.

6

Hart testified that, one day in 2011, David told him he needed to install a smoke detector in Hart's room. Hart temporarily left, and when he returned the room had been demolished. Several plaintiffs testified that David had their kitchens, which existed at the time they began renting the units, removed. Rodriguez testified that his kitchen implements, worth approximately $1,000, were thrown away by David's workers.

In September 2011, around the time Hart's room was destroyed, David came to the property with a box of "Hot Shot" cockroach foggers. Without any warning to the tenants, the foggers were released, causing a strong odor and a "white cloud" to waft through the house. Vaughn went to the doctor due to effects from the fogger and Hernandez developed coughing and pain in her nose and throat.

Plaintiffs testified that they developed anxiety, suffered emotionally, and lost sleep due to the Darwishes' behavior. They stayed at the property because they believed they were entitled to relocation assistance, which the Darwishes refused to pay.

Meanwhile, at trial, the Darwishes' testimony was strikingly evasive, and the testimony of both was repeatedly impeached. Further, in deposition testimony presented at trial, Barbara often referred to plaintiffs as "vagrants." As the trial court later described their testimony, the Darwishes "came across as disingenuous, callous and condescending . . . ."

After the close of evidence, the jury rendered its verdict, finding in favor of plaintiffs on all causes of action at issue: negligence, tortious breach of warranty of habitability, intentional influence to vacate, retaliatory eviction, violation of the LARSO, and fraudulent transfer. The jury's awards to each individual plaintiff ranged from $34,600 to $43,400, consisting of (i) past economic loss and/or relocation benefits, (ii) past noneconomic loss, including mental pain and suffering, and (iii) civil penalties. In addition, Vaughn and Hernandez were each awarded $21,977.80 on the fraudulent transfer claim, relating to the prior judgment for attorney fees in their favor. Finally, the jury found there to be clear and convincing evidence that each defendant acted with malice, oppression or fraud.

7

**B. Second and third phases of trial**

Evidence relating to defendants' wealth was presented at the second phase of trial, determining the issue of punitive damages. After hearing the evidence, the jury awarded each plaintiff a total of $916,666.67 in punitive damages, consisting of $277,777.78 each against Barbara individually, David, and Gingko Rose, and $83,333.33 against Barbara "as agent for 13 Wish Trustee."

The third phase of trial dealt with issues including whether defendants were alter egos of each other. The trial court found that plaintiffs failed to prove their alter ego allegations, but determined that defendant Logerm, as the general partner of Gingko Rose, was liable for Gingko Rose's actions.

**C. Initial entry of judgment and postjudgment issues**

Judgment was entered on August 28, 2013. On August 30, 2013, plaintiffs served notice of entry of judgment.

Defendants thereafter filed motions for new trial and for judgment notwithstanding the verdict, which plaintiffs opposed. On October 25, 2013, a minute order was filed stating that the motion for judgment notwithstanding the verdict was denied, and that the motion for new trial was denied if plaintiffs consented to a reduced award of punitive damages. The minute order referenced an "order" specifying the conditionally remitted amount of punitive damages and the trial court's findings and reasoning, supposedly signed and filed that date. An unsigned and apparently unfiled "order" dated October 25, 2013, however, appears in the record. This document stated that the punitive damages awarded were not reasonably proportionate to the compensatory damages, as they totaled 20 times the highest amount of compensatory damages awarded to a plaintiff. It further stated that defendants were entitled to a new trial on the issue of punitive damages, unless plaintiffs consented to the following punitive damages awards: $60,000 to Vaughn, $60,000 to Hernandez, $25,000 to Hart, $30,000 to Goldson, $25,000 to Rodriguez, and $15,000 to Johnson.

At a hearing on October 28, 2013, the trial court indicated it believed that October 25 was the last day to rule on the motion for new trial, so it had rushed to issue

8

the October 25 ruling. After hearing argument and contemplating the matter, the trial court entered an October 28 minute order stating: "Court, on its own motion, amends its 10-25-13 order on motion for new trial and motion for judgment notwithstanding verdict (argued/submitted on 10-21-13) as follows: Order is deemed a \*\*tentative\*\* ruling, not a final one."

Then, on November 12, 2013, the trial court entered an "amended" order denying the motion for judgment notwithstanding the verdict, and denying the motion for new trial on the condition that plaintiffs consented to reduced punitive damages awards. This amended order closely resembled the court's October 25 unsigned and "tentative" order. Thereafter, on November 20, 2013, the trial court issued a "corrected" amended order making several typographical and/or clerical corrections, including a conditional punitive damages award of $25,000 (instead of $15,000) to Johnson.

Plaintiffs accepted the remitted punitive damages awards in the following amounts: for Vaughn, $60,000 against each of four defendants ($240,000 total); for Hernandez, $60,000 against each of four defendants ($240,000 total); for Hart, $25,000 against each of four defendants ($100,000 total); for Goldson, $30,000 against each of four defendants ($120,000 total); for Rodriguez, $25,000 against each of four defendants ($100,000 total); for Johnson, $25,000 against each of four defendants ($100,000 total). After resolution of further issues, the trial court issued a "corrected amended judgment" on February 18, 2014.

## DISCUSSION

### I. Substantial evidence supports the conclusion plaintiffs were tenants[3]

Defendants argue that plaintiffs were not tenants during the time defendants owned the property, so defendants did not owe them any cognizable duties. Defendants' first assertion in this regard is that plaintiffs never had rental agreements and did not pay rent for years, even when prior landlords owned the property. This assertion is flatly

---

[3] Plaintiffs' December 22, 2014, motion to dismiss appeal and corresponding motion for judicial notice and to take evidence are denied.

contradicted by the record. Plaintiffs, through documentary evidence and testimony, established that they had rental agreements for their units at the property and paid rent to prior owners.[4]

Defendants next contend that the foreclosure on the property nullified plaintiffs' tenancies. This argument finds neither factual nor legal support. The LARSO (which, as we further discuss below, applied to plaintiffs' tenancies) specifies 14 legal reasons a tenant may be evicted. (L.A. Mun. Code, § 151.09, subd. A.) Foreclosure is not one of them. (*Ibid.*) Defendants were informed of this rule against eviction by the Los Angeles Housing Department in October 2010.

In explaining a similar rule against eviction in San Francisco's rent stabilization ordinance, the court in *Gross v. Superior Court* (1985) 171 Cal.App.3d 265, 271-272 (*Gross*), found that the ordinance placed a substantive limitation on an owner's property rights which was not preempted by foreclosure rules. The real party in that case argued that a purchaser at a foreclosure was not a landlord, and so no landlord-tenant relationship was established. In rejecting this argument, the court noted that the definition of "landlord" in the ordinance included a "successor." (*Id.* at p. 274.) Here, the LARSO similarly defines "landlord" to include a "successor." (L.A. Mun. Code, § 151.02.) The *Gross* court also explained that the "'chief consideration'" in such cases is whether the same tenant continues to occupy the unit. (171 Cal.App.3d at pp. 274-275.) "'If the occupant originally took lawful possession of the premises as a tenant, he

---

[4]     Indeed, defendants' opening brief contains numerous, obvious mischaracterizations of the record, as well as incorrect and omitted citations to the record and repeated reference to matters not appearing in the record. These defects violate the rules on appeal (see Cal. Rules of Court, rule 8.204(a)(1)(C) & (a)(2)(C)) and may lead to forfeiture of contentions (see *Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 846; *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384). In addition, by failing to set forth evidence favorable to plaintiffs that supports the judgment, defendants' opening brief does not comply with the substantial evidence standard applicable to much of this appeal. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 713-714.)

10

remains such for the purposes of the [ordinance] no matter what change in ownership occurs . . . .'" (*Ibid.*) Plaintiffs here all occupied their units as tenants under prior owners. Defendants' purchase of the property at a foreclosure sale did nothing to change plaintiffs' status as tenants.

On appeal, defendants also argue that the former owner Majano's filing for Chapter 7 bankruptcy extinguished plaintiffs' leases. Defendants failed to make this argument in the trial court. They now attempt to introduce evidence of Majano's bankruptcy by a request for judicial notice dated February 18, 2016, which we deny in its entirety. "[N]ormally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.'" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) The documents that defendants seek to introduce primarily date from 2009 and 2010, while trial in this matter began in November 2012. Defendants' request, therefore, is an "untimely attempt to introduce new evidence on appeal." (*Templeton Action Committee v. County of San Luis Obispo* (2014) 228 Cal.App.4th 427, 433.)[5, 6] In any event, even if judicial notice were warranted, these documents would not assist defendants, as bankruptcy of a prior owner is not a stated basis for eviction under the LARSO. (L.A. Mun. Code, § 151.09, subd. A; see also *Gross*, *supra*, 171 Cal.App.3d 265, 274-275.)

Finally, defendants argue that plaintiffs' failure to pay rent while defendants owned the property eliminated any obligations owed to plaintiffs. Normally, a failure to

---

[5] Defendants repeatedly referred to these bankruptcy documents in their opening and reply briefs. They did not make their request for judicial notice, however, until all briefs were filed, giving plaintiffs no opportunity to respond to the documents in their appellate briefs. Such gamesmanship will not be countenanced.

[6] Defendants' request for judicial notice was combined with a motion to augment the record. Because the motion to augment was also filed extremely late, for no apparent legitimate reason, we deny it. (See *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 827; Ct. App., Second Dist., Local Rules, rule 2(b), Augmentation of Record [augmentation should be sought within 40 days of the filing of the record].)

11

pay rent would be a valid basis for eviction. (L.A. Mun. Code, § 151.09, subd. A.1.) Substantial evidence, however, supports the conclusion that plaintiffs' tenancies were not terminated by a failure to pay rent here. First, soon after defendants purchased the property, plaintiffs informed them of their rental rates. Barbara, though, demanded that most plaintiffs pay almost twice what they had previously paid for rent. This demand violated LARSO restrictions on maximum rents (L.A. Mun. Code, §§ 151.02, 151.04) and provided plaintiffs with a valid defense to an unlawful detainer action. (L.A. Mun. Code, § 151.11.) Second, several plaintiffs attempted to pay rent anyway, at the rates they had previously been charged, but defendants did not cash the rent checks. Third, both Barbara and David testified that, other than the initial improper demand for rent and April 2012 notices to quit demanding 10 months of back rent, they did not make any request that plaintiffs pay rent.[7] Fourth, the LARSO prohibits a landlord from demanding or accepting rent "for a rental unit without first serving a copy of a valid registration or annual registration renewal statement on the tenant of that rental unit." (L.A. Mun. Code, § 151.05.) The evidence at trial showed that defendants did not even attempt to register plaintiffs' rental units until March 2012, and had not received a registration statement by the time of trial. Thus, given all of these facts, there was ample basis for the jury to conclude that any obligation plaintiffs may have otherwise had to pay rent to the Darwishes was excused.[8]

---

[7]     Pursuant to plaintiffs' request of September 2, 2015, we take judicial notice of documents filed in numerous unlawful detainer actions initiated by defendants against plaintiffs from 2010 to 2012, all of which were resolved in plaintiffs' favor, including the actions based on the April 2012 notices to quit. (Evid. Code, § 452, subd. (d).) Specifically, we take judicial notice of exhibits 1-16 and deny judicial notice of the remaining exhibits.

[8]     Because plaintiffs were shown to be lawful tenants, we reject defendants' related contention that the trial court erred by giving jury instructions pertaining to duties of landlords.

12

## II. The tenancies were properly found subject to the LARSO

Defendants next contend the LARSO did not apply to the property. They argue that the property is a single-family home and therefore exempt from the LARSO. They further assert in their opening brief—without citation to the record or anything else—that, following trial, the city issued a notice confirming the property is a single-family home.

Defendants are correct that single-family homes are generally exempt from the LARSO. "Rental units," defined as subject to the LARSO, do not include: "Dwellings, one family, except where two or more dwelling units are located on the same lot." (L.A. Mun. Code, § 151.02.)

Defendants' argument fails, however, because the evidence supported a conclusion that the property contained more than one "dwelling unit," which is defined as a "group of two or more rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes." (L.A. Mun. Code, § 12.03.) At the time defendants purchased the property, it had four kitchens. Two of these kitchens were in rooms rented by Vaughn and Johnson, while the others were for communal use. Six households lived in the house. One unit was occupied by two people, Hernandez and her daughter. This evidence supported a conclusion that at least four, and possibly six, dwelling units were on the property. (See *Salazar v. Maradeaga* (1992) 10 Cal.App.4th Supp. 1, 3-4 (*Salazar*) [finding that the LARSO applied to an illegal garage unit].)

The finding that the property was not a typical one-family dwelling exempt from the LARSO was further supported by Barbara's March 2012 letter to the Los Angeles Housing Department, seeking to register "'7' rooms which are currently rented individually." It also found support in the Department of Building and Safety's October 2010 substandard order, which noted that the property was being used as a "boarding house." Boarding houses holding long-term occupants are subject to the LARSO. (L.A. Mun. Code, § 151.02.)

13

Further, the fact that the property was not registered under the LARSO did not mean the tenancies were not subject to the LARSO.[9, 10] In *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, a defendant landlord argued that the tenancy of a renter, who lived in an unpermitted guesthouse not registered under the LARSO, was not governed by the LARSO. At trial, a witness from the Los Angeles Housing Department testified that the City would not allow the landlord to register the guesthouse because it was built without permits. (*Carter*, at p. 1045.) The court found that, although the rental agreement was unlawful and the property was not registered, the LARSO still applied. (*Carter*, at pp. 1048-1050.) Otherwise, to deny the tenant relief "would effectively shift landlords' burdens under the RSO to tenants, as it would force tenants who learned that their rental units were unlawful to terminate their leases voluntarily . . . ." (*Id.* at p. 1050.)[11]

---

[9]  In their request for judicial notice, defendants seek to introduce a document, apparently from the Los Angeles Housing & Community Investment Department, which references the property. Among other things the document states that the property "has never been registered," and that "the Department has not had the opportunity to determine whether the property is subject to the provisions of the RSO." Under an "other notes" heading, the document states "record indicate [*sic*] property address is a single family residence. And it is not under the RSO." The meaning and effect of this document is unclear. It is also hearsay, and judicial notice is not warranted.

[10]  It is possible that, after demolishing Hart's room, constructing an interior stairway, and removing numerous kitchens and bathrooms, defendants turned what was once a multiple-dwelling unit property into a more typical single-family residence. This would not remove the plaintiffs' tenancies from the protections of the LARSO, however. Instead, the LARSO would require defendants to pay relocation fees to plaintiffs. (L.A. Mun. Code, § 151.09, subd. G; see also *Salazar*, *supra*, 10 Cal.App.4th Supp. 1, 5-6.)

[11]  *Gabor v. Cox* (1994) 26 Cal.App.4th Supp. 16, a case relied on by defendants, is distinguishable. At the time the case was decided, the rent stabilization ordinance applied when a lot contained three or more dwelling units; only two potential dwelling units were at issue in the case. (*Id.* at p. 19.) Furthermore, the house at issue was a single-family residence with an interior stairway. (*Ibid.*) In contrast, the evidence showed that the property here contained at least four and possibly six dwelling units, some of which were located on the second floor, which was only accessible by exterior stairs.

14

In a related argument, defendants contend that the trial court erred by either giving the jury instructions on the LARSO or allowing the jury to decide the applicability of the LARSO. We disagree. Although the verdict form did present plaintiffs' claim for violation of the LARSO to the jury, the record shows that the trial court heard extensive evidence and argument regarding the applicability of the LARSO prior to determining that the claim could go forward to the jury. Under these circumstances, the trial court did not err by allowing the jury to decide whether plaintiffs ultimately proved their claim.

## III. **Defendants' motion for mistrial was properly denied**

Defendants assert that the opening statement of plaintiffs' attorney was excessively inflammatory and that mistrial (requested by defendants' attorney following the opening statement) should have been granted. Defendants take issue with various assertions made during the opening statement, including that "the Darwishes are experienced litigators," that they "bully and they threaten with the help of attorneys to get their way," and that they are "experienced liars."

Personal attacks on the character of an adverse party, as well as "attempts to appeal to the prejudice, passions or sympathy of the jury" can be grounds for mistrial. (*Stone v. Foster* (1980) 106 Cal.App.3d 334, 355.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.)

We find that the trial court did not abuse its discretion by denying a mistrial. Although some of the statements by plaintiffs' counsel were overzealous,[12] viewed in the context of the case as a whole they did not constitute prejudicial misconduct. (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [party must demonstrate misconduct was prejudicial to justify new trial]; *Sabella v. Southern Pac. Co.* (1969) 70

---

[12] Defendants' counsel was not blameless in this regard. During closing argument, she asserted that plaintiffs were trying to "extort money" and that they were "burglars."

15

Cal.2d 311, 318 ["it is only the record as a whole, and not specific phrases out of context, that can reveal the nature and effect of" attorney misconduct].) Furthermore, statements by plaintiffs' attorney, though impolite, actually found some support in the evidence at trial. (See *Hawk v. Superior Court* (1974) 42 Cal.App.3d 108, 121 [opening statement should be based on evidence reasonably believed to be admitted at trial].) Several plaintiffs testified that David, while threatening to follow them for years, told them he had sued many people. And, given the number of times the Darwishes were impeached at trial, and their generally evasive testimony, a claim that they were "liars" was not baseless.

Indeed, rather than the inflammatory nature of the opening statement, the trial court was more concerned that counsel's references to the filing of lawsuits could run afoul of the litigation privilege (Civ. Code, § 47). The court determined that a curative instruction was the proper remedy, and instructed defendants' counsel to draft such an instruction. It appears from the record that defendants' attorney never provided the court with the requested instruction. Nevertheless, the jury was eventually instructed, in part, that "[u]nder California Law, the filing of an unlawful detainer action or any other lawsuit is absolutely privileged against any later claims for damages based on the lawsuit." This instruction was sufficient to cure any possible prejudice.[13]

## IV. Substantial evidence supports the jury's decision on fraudulent transfer

As noted above, an unlawful detainer action was brought by 13 Wish, as trustee for the trust holding the property, in October 2010. The matter was decided in favor of plaintiffs on January 14, 2011, and attorney fees totaling $43,955.60 were eventually

---

[13]    Actually, if there was any prejudice arising from this instruction, it more likely affected plaintiffs. Plaintiffs brought a claim under Civil Code section 1942.5. A plaintiff may base such a claim on a landlord's filing of an action to recover possession, if the filing was in retaliation for a tenant's exercise of legal rights. (*Banuelos v. LA Investment, LLC* (2013) 219 Cal.App.4th 323, 332-333.) It appears that the jury was improperly instructed that they could not consider defendants' numerous unlawful detainer actions against plaintiffs in deciding the retaliation claim. Since plaintiffs did not appeal from this issue, however, we do not discuss it further.

16

awarded to Vaughn and Hernandez. On January 19, 2011, Barbara prepared a grant deed transferring the property from the trust to Gingko Rose. At trial in this matter, plaintiffs claimed that this transfer of the property was made with the intent to prevent Vaughn and Hernandez's efforts to collect the awarded fees. The jury agreed. On appeal, defendants argue that there was insufficient evidence of intent to support a fraudulent transfer claim, and that the claim was improper because the transfer of the property preceded the fees award.

Civil Code section 3439.04, subdivision (a) states: "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (1) With actual intent to hinder, delay, or defraud any creditor of the debtor. [¶] (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: [¶] (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. [¶] (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." In determining "actual intent," a fact-finder may consider, among other factors, "[w]hether the transfer was of substantially all the debtor's assets," "[w]hether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred," and "[w]hether the transfer occurred shortly before or shortly after a substantial debt was incurred." (Civ. Code, § 3439.04, subd.(b)(5), (8), (10).)

There clearly was substantial evidence to find that the transfer was made with an intent to hinder creditors, Vaughn and Hernandez. The transfer of the property from the trust was made soon after the unlawful detainer action was decided against the trustee, with an adverse attorney fees award looming. The fact that the transfer occurred prior to the actual fees award was of no consequence. A creditor's claim can arise "after the transfer." (Civ. Code, § 3439.04, subd. (a); see also subd. (b)(10).)

17

Further, the jury had legitimate reasons to disbelieve Barbara's explanation that the property was transferred to avoid foreclosure by Gingko Rose because it had lent money for the initial purchase. The grant deed, prepared by Barbara, described the transfer as a "bonafide [*sic*] gift," contradicting her testimony that the transfer was repayment for a loan. Moreover, evidence of the purported loan was lacking. Barbara testified that no documents evidenced the loan from Gingko Rose to purchase the property, and Barbara did not know the terms of the loan. Additionally, the evidence showed that, other than the property itself, the trust had minimal or no assets, a fact further supporting the finding of actual intent. (Civ. Code, § 3439.04, subd. (b)(5).) Thus, substantial evidence supported the judgment on the fraudulent transfer claim.

**V. <u>Barbara and David could properly be held personally liable</u>**

Defendants next argue that all of plaintiffs' causes of action are of a type directed only against landlords. They assert that Gingko Rose was the landlord, and that Barbara and David could not be personally liable for its conduct. This argument fails.

One cause of action upon which plaintiffs were awarded damages was for violation of the LARSO. This claim was based, in part, on defendants' failure to pay relocation fees, an obligation that the LARSO assigns to the "landlord." (L.A. Mun. Code, § 151.09, subd. G.) The LARSO defines "landlord" as including an "owner, lessor, or sublessor," as well as the "agent, representative or successor of any of the foregoing." (L.A. Mun. Code, § 151.02.) The evidence supported the conclusion that Barbara and David were agents and/or representatives of Gingko Rose, so the finding that they were individually liable was proper.

Additionally, Civil Code section 1942.5, under which plaintiffs brought their retaliatory eviction claim, provides that an "agent of a lessor" who violates the statute shall be liable for damages sustained by a lessee. (Civ. Code, § 1942.5, subd. (f).) Again, as agents, Barbara and David were properly found liable.

Moreover, as agents and managers of Gingko Rose, Barbara and David could be held liable for their personal participation in tortious conduct. (*People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1213; *Bonfigli v. Strachan* (2011) 192

18

Cal.App.4th 1302, 1317-1318.) Abundant evidence supported a conclusion that Barbara and David personally participated in tortious conduct, including through their repeated harassment of plaintiffs. This evidence supports the jury's findings of individual liability, including with respect to the tortious breach of warranty of habitability and the intentional influence to vacate claims. Thus, the findings of individual liability were sufficiently supported by the evidence and the law.

## VI. An award of punitive damages was justified

Punitive damages were properly awardable in this matter. At least three causes of action supported an award for punitive damages: tortious breach of warranty of habitability (see *Penner v. Falk* (1984) 153 Cal.App.3d 858, 867; *Smith v. David* (1981) 120 Cal.App.3d 101, 112, fn. 3); retaliatory eviction (see Civ. Code, § 1942.5, subd. (f)(2); *Aweeka v. Bonds* (1971) 20 Cal.App.3d 278, 281); and fraudulent transfer (see Civ. Code, § 3294, subd. (a); *Cheung v. Daley* (1995) 35 Cal.App.4th 1673, 1676).

Substantial evidence supported the jury's verdict that defendants were guilty of "oppression, fraud, or malice." (See Civ. Code, § 3294.) The jury reasonably could have found that punitive damages were justified based on, among other acts: defendants' repeated entries into plaintiffs' residence without notice, defendants' practice of frequently videotaping and photographing plaintiffs and their personal items, the threats to follow plaintiffs for decades, the verbal insults lobbed at plaintiffs, and the release of cockroach foggers without warning.

Defendants argue, however, that any award of punitive damages cannot be upheld because no competent evidence of defendants' financial condition was presented. "[A]n award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109.) "[T]he most important question is whether the amount of the punitive damages award will have deterrent effect—without being excessive. Even if an award is entirely reasonable in light of the other two factors . . . (nature of the misconduct and amount of compensatory damages), the award can be so disproportionate to the

19

defendant's ability to pay that the award is excessive *for that reason alone*." (*Id.* at p. 111.)

We reject defendants' argument because, by stonewalling attempts to obtain evidence of financial condition and disregarding a court order, defendants have forfeited any right to complain of a lack of sufficient financial evidence. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 608-609 (*Davidoff*); *Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 453-454.)

Following the jury's verdict on the first phase of trial, the trial court issued wide-ranging orders requiring defendants to deliver to plaintiffs' counsel documents evidencing their financial condition, including: statements from bank accounts, checking accounts, and credit card accounts in defendants' own name as well as for entities in which they had interests; title to real estate, including mortgage statements and appraisals; loan applications made over the preceding six years; outstanding promissory notes; leases; and retirement account statements. In spite of these broad orders, defendants' production was paltry, only containing a few records showing interests in six properties.

Plaintiffs themselves produced evidence relating to defendants' net wealth, obtained through public records of property ownership and through subpoena. One document obtained by subpoena to a bank was a loan application made by David in 2007—the type of document defendants were expressly ordered to produce that they did not produce. Based on the information plaintiffs discovered through their own efforts,[14] an expert witness retained by plaintiffs testified that defendants' real estate holdings had a fair market value of $16 million to $57 million at the time of trial.

_____

[14] Defendants argue that this information was not properly obtained by plaintiffs and therefore should not be considered. The trial court, however, found that defendants were given notice that plaintiffs sought to subpoena records from financial institutions. It found defendants' possible failure to give notice of a subpoena issued in Iowa immaterial. Given the circumstances, the trial court's decision does not constitute reversible error.

20

During this punitives phase of trial, defendants called a bookkeeper for Gingko Rose to testify. He testified, among other things, that he prepared written market analyses for properties owned by Gingko Rose.

Following the bookkeeper's testimony, the trial court noted that the market analyses the bookkeeper testified about were appraisals—again, documents ordered produced that were not. The trial court found that by failing to produce such documents, which defendants' own witness acknowledged creating, defendants violated the court's orders: "There were no financial statements produced in response to plaintiff which [was] my order."

As stated of the defendant in *Davidoff*, "By his disobedience of a proper court order, defendant improperly deprived plaintiff of the opportunity to meet his burden of proof on the issue. Defendant may not now be heard to complain about the absence of such evidence." (78 Cal.App.4th 597, 609.) Defendants, here, likewise disobeyed valid court orders, and now seek to leverage an asserted lack of evidence, caused by their own insubordination, into an advantage on appeal. We reject their efforts to do so.[15]

After hearing evidence relating to defendants' financial condition, the jury awarded each plaintiff a total of $916,666.67 in punitive damages. The trial court later attempted to remit these punitive damages significantly, stating that a range of a total of $100,000 to $240,000 per plaintiff was called for. The evidence presented at trial sufficiently shows that defendants can afford to pay these lower amounts of punitive damages, which, as we discuss further below, are appropriate.

---

[15]     Defendants also complain that the trial court did not allow David to testify at the punitives stage of trial. This again was a situation created entirely by defendants. Plaintiffs attempted to call David to testify during the second phase, but defendants' attorney stated David would not appear. It was only after plaintiffs introduced documents relating to defendants' financial condition (which defendants failed to produce themselves) that defendants sought to call David to testify. The trial court found it "not fair to plaintiffs at all" if David were to testify on rebuttal after refusing to testify earlier. Given the earlier refusal, and defendants' disobedience of the court's orders, we do not find error in the court's ruling.

21

## VII. **The attorney fees award was not an abuse of discretion**

Plaintiffs were awarded $845,351.25 in attorney fees. Fees were properly awardable pursuant to the LARSO (L.A. Mun. Code, § 151.09, subd. H), as well as on plaintiffs' claims for breach of the warranty of habitability (Civ. Code, § 1942.4, subd. (b)(2); *Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1297) and for retaliatory eviction (Civ. Code, § 1942.5, subd. (g); *Rich v. Schwab* (1998) 63 Cal.App.4th 803, 818).

Defendants argue that the fees award was excessive. We review the trial court's determination for an abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 (*Ketchum*).)

In moving for a fees award, plaintiffs' counsel submitted extensive evidence, including 67 pages of billing records, detailing the work done on the case, which at that point had lasted over two and a half years. The record shows that the litigation was hotly contested by both sides. As the trial court stated, "this matter was fought tooth and nail, so I'm not surprised at the amount of the fees." The trial court also had reasonable basis to conclude that an hourly rate of $500 was "in keeping with what we see in the community" and that counsel was "well-versed in the areas of law at issue in the case."

In determining the amount of fees, the trial court elected to adjust the lodestar by awarding a 1.5 multiplier to compensate counsel for the risks involved in prosecuting the matter on a contingency basis. One factor a trial court may consider when deciding whether to adjust the lodestar by a multiplier is "the contingent nature of the fee award." (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49; (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1217-1218 (*Amaral*).) "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class." (*Ketchum*, *supra*, 24 Cal.4th 1122, 1138.)

This matter involved somewhat complicated legal issues for which only a relatively small amount of compensatory damages were potentially recoverable. Indeed, most tenants of modest means would likely have difficulty finding a lawyer to take on

22

such a case because of the prospect of a small recovery. The trial court was therefore justified in considering counsel's contingent risk in pursuing the case, as well as other factors, in choosing to award a multiplier of 1.5. (*Amaral*, *supra*, 163 Cal.App.4th 1157, 1216.)

Furthermore, the contingent risk persisted throughout the case, since after the initial verdict was entered, defendants continued to file motions arguing that no award of damages was proper. The record shows that defendants filed at least three postverdict motions directly challenging the liability and damages findings, as well as associated ex parte applications. Plaintiffs' ability to collect on the judgment, including attorney fees, also remained contingent. As demonstrated at trial, defendants fraudulently transferred property in order to avoid collection of a prior fees award. Thus, we find that the trial court did not abuse its discretion in awarding a multiplier of 1.5 to the fees generated through the entirety of the case.

## VIII. <u>The original judgment was effective, but punitive damages must be reduced</u>

Plaintiffs served notice of entry of judgment on August 30, 2013, making October 29, 2013, the last day to rule on defendants' new trial motion. (Code Civ. Proc., § 660.) The trial court purported to rule on the motion on October 25, 2013, but then, on October 28, 2013, entered an order deeming the prior ruling tentative. We find that the trial court failed to enter a timely new trial order, and therefore defendants' motion for new trial was denied by operation of law.

Code of Civil Procedure sections 657 and 660 lay out mandatory procedural steps for ruling on a motion for new trial, which must be decided within 60 days of (as applicable here) service of notice of entry of judgment. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899 (*Sanchez-Corea*).) When a motion for new trial is granted, the order granting the motion must state the grounds relied on by the court. (Code Civ. Proc. § 657; *Sanchez-Corea*, at p. 899.) An order based on excessive damages cannot be affirmed unless this ground is specified in the trial court's order. (Code Civ. Proc. § 657; *Sanchez-Corea*, at p. 899.) Moreover, even though an order granting new trial need not itself contain specification of the reasons for the order,

23

specification of the reasons must be signed and filed by the court within 10 days of the filing of the order. (Code Civ. Proc. § 657; *Sanchez-Corea*, at p. 899.)

The trial court's purported order of October 25, 2013, did not comply with these requirements. The trial court's minute order, which stated that the motion for new trial was denied, "if plaintiffs consent to reduced punitive damages awards," would have actually been, if effective, an order granting new trial. (See *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 147.) But the minute order did not state any grounds for reducing the punitive damages awards. The order was therefore defective. (See Code Civ. Proc., § 657; *Sanchez-Corea*, *supra*, 38 Cal.3d 892, 899.) Furthermore, no signed statement of reasons was filed within 10 days, rendering the purported order void. (See Code Civ. Proc., § 657; *Sanchez-Corea*, at p. 899.) Although the record contains an "order" explaining the court's reasoning on the motion for new trial, this document is neither signed nor file-stamped. (See Code Civ. Proc., § 657; *Sanchez-Corea*, at p. 899.) Moreover, even if this October 25, 2013, unsigned "order" could somehow be considered valid, the trial court timely vacated the order on October 28 by ruling that the order was merely tentative. (See *Jones v. Sieve* (1988) 203 Cal.App.3d 359, 370 [trial court may reconsider an order if still within Code of Civil Procedure section 660's 60-day limitation period].)

Thus, no order granting new trial was issued by and effective on October 29, 2013, the last day to rule on such a motion. Defendants' motion for new trial was therefore denied by operation of law. (Code Civ. Proc., §§ 660, 657.) And any further purported order on the motion for new trial—including the one entered on November 12, 2013—was defective for exceeding the 60-day jurisdictional period. (*Sanchez-Corea*, *supra*, 38 Cal.3d 892, 903.)

This leaves the August 28, 2013, judgment as the effective final judgment. This judgment, however, awarded each plaintiff a total of $916,666.67 in punitive damages, an amount (as the trial court noted) 20 times greater than the highest amount of compensatory damages (not including civil penalties) awarded to any plaintiff. We find that this ratio is excessive and not proportionate to the wrongs committed by defendants

24

and the harm suffered by plaintiffs.  (See *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182-1183.)  Instead, we believe that the following punitive damages awards are appropriate:  for Vaughn, $240,000 total; for Hernandez, $240,000 total; for Hart, $100,000 total; for Goldson, $120,000 total; for Rodriguez, $100,000 total; for Johnson, $100,000 total.  Remittitur of punitive damages in this manner is proper.  (See *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1704.)

## DISPOSITION

The August 28, 2013, judgment is modified so that plaintiffs are awarded the following amounts of punitive damages:  Vaughn—$60,000 against each of the four defendants Barbara Darwish DBA 13 Wish Trustee, Barbara individually, David individually, and Gingko Rose (collectively, the four punitives defendants) ($240,000 total); Hernandez—$60,000 against each of the four punitives defendants ($240,000 total); Hart—$25,000 against each of the four punitives defendants ($100,000 total); Goldson—$30,000 against each of the four punitives defendants ($120,000 total); Rodriguez—$25,000 against each of the four punitives defendants ($100,000 total); Johnson—$25,000 against each of the four punitives defendants ($100,000 total).  The judgment is affirmed in its entirety as so modified, on the condition that plaintiffs timely consent in writing to such a reduction in accordance with California Rules of Court, rule 8.264(d).  If consent is not filed within the time allowed, judgment for any plaintiff not filing consent is reversed as to the amount of punitive damages only, and the matter is remanded for a new trial to determine the amount of punitive damages as to that plaintiff, liability having been established.  The attorney fees award in favor of plaintiffs is also affirmed.

Plaintiffs shall recover their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:

CHAVEZ, J.                                HOFFSTADT, J.

25